# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5378 | **DATE** | 5/22/2002 |
| **CASE TITLE** | John Byrne vs. Avon Products, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Because Byrne has not shown any genuine issue of material fact, Avon is entitled to a judgment as a matter of law. Its summary judgment motion is granted in its entirety, and this action is dismissed with prejudice. (14-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 24 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SN | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN BYRNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  00 C 5378 |
| | ) | |
| AVON PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

MAY 2 4 2002

## MEMORANDUM OPINION AND ORDER

John Byrne ("Byrne") has charged his former employer Avon

Products, Inc. ("Avon") with employment discrimination in

violation of the Americans with Disabilities Act ("ADA," 42

U.S.C. §§12101-12117)[1] and the Family and Medical Leave Act

("FMLA," 29 U.S.C. §§2601-2654).  Avon seeks summary judgment

under Fed. R. Civ. P. ("Rule") 56, and both sides have complied

with District Court LR 56.1.[2]  Avon wins.

---

[1]  Further ADA citations will take the form "Section --,"
using the Title 42 numbering rather than ADA's internal section
numbers.

[2]  LR 56.1 is designed to facilitate the resolution of Rule
56 motions by calling for evidentiary statements and responses to
such statements (in each instance with record citations), thus
highlighting the existence or nonexistence of factual disputes.
This opinion cites to Avon's LR 56.1(a)(3) statement as "A. St.
¶--" and to Byrne's 56.1(b)(3)(B) statement of additional facts
as "B. St. ¶--."  Byrne's response to Avon's LR 56.1(a)(3)
statement is cited as "B. Resp. ¶--," although where an A. St.
assertion is not controverted a citation to the latter ordinarily
suffices.  Avon's response to Byrne's statement of additional
facts is cited as "A. Resp. ¶--."  This opinion employs the same
"A." and "B." abbreviations when referring to the parties'
exhibits ("Ex.") and memoranda ("Mem.").

Familiar Rule 56 principles impose on Avon the burden of establishing the lack of a genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (St. Louis N. Joint Venture v. P & L Enters., Inc., 116 F.3d 262, 265 n.2 (7th Cir. 1997)). As Pipitone v. United States, 180 F.3d 859, 861 (7th Cir. 1999) has quoted from Roger v. Yellow Freight Sys., Inc., 21 F.3d 146, 149 (7th Cir. 1994):

> A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As with any summary judgment motion, this Court accepts nonmovant Byrne's version of any disputed facts, but only so long as it is supported by record evidence. What follows in the Facts section is culled from the parties' submissions in that manner.

## Facts

### Byrne's Employment and Discharge

Byrne was hired by Avon on July 1, 1994 and worked at its Morton Grove facility until his discharge on November 18, 1998[3] (A. St. ¶2). Throughout his employment with Avon Byrne was the

---

[3] Because all operative events bearing on Byrne's claims occurred in 1998, each date referred to later in this opinion omits the year designation.

sole stationary engineer on the third shift, which ran from 10 p.m. to 6 a.m. (id. ¶3). His duties included maintaining the operation of the facility's steam system and assisting other Avon employees as needed (id. ¶4). Byrne reported to Facilities Engineer James Sparks ("Sparks"), who in turn reported to Engineering Unit Leader Gregory Korak ("Korak")(id. ¶7). Until November 1998 Byrne had an almost perfect attendance record, consistently worked overtime and was considered by Avon management to be a very dependable employee (B. St. ¶¶60, 63).

On November 7 Avon employee Rick Anderson ("Anderson") entered the carpenter's shop at the plant and saw Byrne lying back in a chair with his feet propped up and his eyes closed (A. St. ¶¶8-9). Byrne denies that he was sleeping, but he admits that Anderson found him as described (B. Resp. ¶¶9-10). On November 9 Anderson told Sparks that he had discovered Byrne sleeping in the carpenter's shop (id. ¶11). Sparks in turn told Korak, who thought that it was unusual for Byrne to be in the shop, a restricted area located approximately 300 feet away from Byrne's work area in the boiler room (id. ¶¶6, 12; B. St. ¶117). Because Byrne needed access to the tools in the carpenter's shop in case he had to make a repair, he was one of some 10 to 15 employees issued a security card that would open the door to the shop (B. St. ¶¶108, 111, 115). Employees were known to use the carpenter's shop as a break room (B. St. ¶107).

3

Sparks and Korak discussed the matter, and both concluded that Byrne might pose a performance issue (A. St. ¶12). They decided to review the security log for the carpenter's shop, which automatically records the date and time that anyone uses an access card to enter (but not to leave) the shop (A. St. ¶13; B. St. ¶109). Log entries showed that Byrne had entered the shop on every scheduled workday from October 26 until November 11, often two or three times a shift (A. St. ¶14). According to the log, Byrne had been in the carpenter's shop for approximately 52 minutes when Anderson discovered him in the chair with his eyes shut (id. ¶15).

After reviewing the security log, Sparks and Korak decided to install a video camera in the shop to record what Byrne was doing in the room (B. St. ¶120). By the evening of November 11 a camera was installed at a cost to Avon of about $1,000 (id. ¶¶124-25). At that point Sparks did not talk to Byrne about the matter because he believed that would have "compromised the investigation" (id. ¶123).

On the morning of November 12 both Sparks and Korak reviewed the videotape from Byrne's just-concluded 10 p.m. to 6 a.m. shift (A. St. ¶18). It showed (id. ¶19):

    1.  From 12:30 a.m. until 2:43 a.m. Byrne read and slept while sitting in a chair in the carpenter's shop,

    2.  From 2:44 a.m. until 3:05 a.m. Byrne read while sitting in a chair in the carpenter's shop.

4

3. From 4:25 a.m. until 4:51 a.m. Byrne again read while sitting in a chair in the carpenter's shop.

At his later deposition Byrne denied sleeping during that shift but admitted that he was in the shop for approximately three hours without working (id. ¶20). On the following morning, November 13, Sparks and Korak reviewed the videotape from Byrne's shift the previous night and found (id. ¶22):

1. From 10:19 p.m. until 10:52 p.m. Byrne read while sitting in the carpenter's shop.

2. From 11:53 p.m. until 1:46 a.m. Byrne slept while sitting in the carpenter's shop.[4]

3. From 1:59 a.m. until 4:20 a.m. Byrne slept with the lights off.

At his deposition Byrne denied sleeping during that shift too, but he admitted that he was in the shop for nearly five hours without working (id. ¶23).

Korak and Sparks agreed that they would try to speak with Byrne sometime during his November 16-17 shift, but they did not tell Byrne of their intention to meet with him (id. ¶27; B. St. ¶139). They and Avon's Senior Manager of Human Resources Brenda LeMire have differing recollections about whether the purpose of the meeting was to suspend or terminate Byrne or simply to discuss the situation with him and then to decide what action to take (id. ¶¶140-48). In any event, Korak did not prepare

---

[4] Avon asserts that Byrne was reading as well as sleeping during this period, which Byrne denies (B. Resp. ¶22).

termination papers before attempting to meet with Byrne (id. ¶149).

Sparks arrived at Avon at 3 a.m. on November 17, planning to meet with Byrne and Korak (A. St. ¶32). He looked for Byrne but was unable to find him (id. ¶33). Sparks then spoke with a security guard, who told him that earlier in the shift he had an "odd" conversation with Byrne, during which Byrne had shaken hands with the guard, said good-bye and then left the plant (B. St. ¶¶156, 165). In addition, the security guard told Sparks that Byrne had left a message on Spark's voicemail (A. St. ¶33). In that message Byrne said that he was "not feeling well" and would be out for the rest of the week (id. ¶30). When Korak arrived at 4 a.m., Sparks told him about the voicemail message and Byrne's discussion with the security guard (B. St. ¶165).

At about 4 a.m. Sparks called Byrne at home (A. St. ¶34). He spoke with Byrne's sister Sheila Byrne ("Sheila"), who said that if Byrne was not at work he was probably at the home of Byrne's other sister Madge Rodgers ("Rodgers") (id.). Sheila telephoned her sister and then called Sparks back to let him know that Byrne was indeed at the Rodgers house (id. ¶¶34-35). During one of those conversations Sparks asked Sheila if she had noticed Byrne "being strange" (id. ¶36; B. St. ¶226). She said "no" (A. St. ¶36).

Sparks called the Rodgers household at least three and

6

possibly more than five times that day, but he was initially able to reach only Rodgers and not Byrne (A. St. ¶37; B. St. ¶186). First Rodgers told Sparks that Byrne was vomiting and too ill to speak on the phone (A. St. ¶37; B. St. ¶¶176, 178). She said that Byrne was "sick, very sick," but she was not sure what was wrong with him (B. St. ¶225). In two of their conversations Sparks told Rodgers to get Byrne to a doctor (id. ¶224). At another point in one of their conversations, Sparks asked Rodgers whether she had noticed that Byrne was acting "strange" or that there was "something wrong with him" (id. ¶227). Like Sheila, she said "no" (B. Ex. F at 44).

Finally, at about 1 p.m. November 17 Sparks spoke with Byrne on the telephone (A. St. ¶39). During that conversation Byrne was mumbling and repeating words (B. St. ¶189). When Sparks asked him what was wrong with him, Byrne did not answer (id. ¶217). Sparks also asked Byrne for his doctor's number but received no answer (id. ¶218). When Sparks asked if he had a fever, Byrne just repeated "fever, fever" (B. St. ¶220; A. Ex. J). Sparks told Byrne to come to a meeting at 3:30 p.m. at the Avon plant, stressing that it was important (A. St. ¶40). Although Byrne at first declined, "mumbling" that he had a doctor's appointment, he eventually agreed to come to the meeting (B. St. ¶219; A. St. ¶41).

In fact Byrne did not appear for that meeting with Sparks,

nor did he call to cancel it (A. St. ¶41). Instead Rodgers took

Byrne to the hospital, where he was admitted but not diagnosed

(id. ¶42). No one at Avon was told that Byrne was admitted to

the hospital until the following morning, November 18 (id. ¶¶42,

47).[5]

When Byrne failed to appear for the scheduled meeting with

Sparks and Korak, Korak immediately recommended to both Human

Resources Supervisor Mary Ellen Spedale and General Manager Bill

Baronti that Byrne be terminated (id. ¶43). Both agreed to the

termination, and Korak prepared a standard discharge letter and a

"discussion form" to effect it (id.). On November 18 Avon mailed

Byrne the letter terminating his employment for "misuse" of

company time (id. ¶44). During his later deposition Byrne

conceded that he misused company time by exceeding allotted break

---

[5]   Throughout the filings Byrne's counsel consistently (and
insistently) argues that a genuine issue of material fact exists
as to whether Avon first learned of Byrne's hospitalization on
November 17 or 18. That assertion is based on the fact that
Sparks originally stated in his deposition that Rodgers told him
about Byrne's hospitalization on the 17th (B. St. ¶235). After a
break in the deposition, however, Sparks returned and corrected
himself, stating that the conversation with Rodgers actually took
place on November 18 (A. Resp. ¶235). If the November 17 date
were right, it would move Avon's knowledge of Byrne's hospital
admission back to the same day on which the termination decision
was made. But any such possibility is negated by the fact that
Byrne's own sister Rodgers corroborates November 18 as the date
on which she first informed Avon about Byrne's hospitalization
(id.; A. St. ¶47). In light of Rodgers' corroboration, any
attempt to create a genuine issue of material fact on that
subject is, to be charitable, disingenuous. Summary judgment
treatment does not call for such an unreasonable inference.

times for extended periods (id. ¶45).

Byrne's Mental State

According to Byrne's psychiatrist, sleep disturbances caused by depression began affecting his work in October 1998 (B. St. ¶92). When Byrne arrived at work on November 16, he felt nauseous and nervous (id. ¶93). Byrne started to hallucinate, believing that there were cameras in the boiler room and that security guards were following him (id. ¶94). He began dry heaving and thought he might be having a heart attack, and he called Rodgers to come and pick him up (id. ¶95).

While at Rodgers' house that morning, Byrne grabbed a pair of scissors and tried to cut his wrists (id. ¶97). Byrne then locked himself in the family room until about 2 p.m. November 17 (id. ¶98). Because of his debilitation, Byrne has no clear recollection of the conversation with Sparks (id. ¶99). He remembers agreeing to meet with Sparks but then recalls having another panic attack, during which he tried to flush his head down the toilet and banged his head against the wall (id.). Byrne then went to the hospital, where he stayed for eight days and was eventually diagnosed with major depression (id. ¶103; A. St. ¶50).

Until mid-December Byrne attended a day program for therapy (B. St. ¶¶103-04). After the therapy ended Byrne continued to see his psychiatrist every month, later reducing his appointments

to once every three months (id. ¶105).

ADA Claim

Avon invokes <u>Palmer v. Circuit Court of Cook County</u>, 117 F.3d 351 (7th Cir. 1997) to make the threshold argument that because Byrne was fired for his own misconduct, he falls outside the umbrella of protection provided to employees by ADA (A. Mem. 4-6). <u>Palmer</u>, <u>id.</u> at 352 held:

> But if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act.

Avon's reliance on that language is no better than specious, as even a brief analysis readily demonstrates. Unlike <u>Palmer</u>, where it was already established that the employee was fired "because of" her unacceptable behavior, Byrne asserts that he was fired "because of" his mental illness (B. Mem. 10-13). Moreover, Avon ignores <u>Palmer</u>'s later recognition (117 F.3d at 353) that "an employer has a statutory duty to make a 'reasonable accommodation' to an employee's disability." Because there is no evidence suggesting that Byrne is violent or presents a danger to his coworkers, <u>Palmer</u>'s summary dismissal of the reasonable accommodation question based on the employee's repeated threats to commit violent acts is inapposite here.

Section 12112(a) prohibits an employer from discriminating against "a qualified individual with a disability because of the

10

disability." Under ADA's "Title I, a covered entity may discriminate in two ways: disparate treatment of or failure to accommodate a disabled employee" (Stevens v. Illinois Dep't of Transp., 210 F.3d 732, 736 (7th Cir. 2000)). Because Byrne charges Avon with both disparate treatment and failure to accommodate, this opinion examines Byrne's wrongful termination claim from both perspectives.

Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1032 (7th Cir. 1999) (citations omitted and adapted to this case) describes a plaintiff's required showing[6] under failure-to-accommodate analysis:

> (1) [he] was or is disabled; (2) the defendant was aware of [his] disability; (3) [he] was otherwise qualified for [his] job; and (4) the disability caused the adverse employment action (a factor which is implied if not stated).

And as for the disparate treatment approach, Gorbitz v. Corvilla, Inc., 196 F.3d 879, 882 (7th Cir. 1999) (adapted to this case) says that Byrne must first show:

> (1) [he] was disabled; (2) [his] work performance met [Avon's] legitimate expectations; (3) [he] was

---

[6] In the summary judgment context, of course, Byrne's burden is only that of creating reasonable inferences, not one of proof as such (see Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what an employee must "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting Byrne's lesser burden of creating reasonable inferences, not the actual burden of persuasion.

> terminated; and (4) the circumstances surrounding [his]
> termination indicate that it is more likely than not
> that [his] disability was the reason for the
> termination.

Because Byrne must establish that he is "a qualified individual

with a disability" to proceed under either approach, that

question will be addressed first.

## Qualified Individual with a Disability

To show that he has a disability within the meaning of ADA,

Byrne must demonstrate not only that he suffers from an

"impairment," but also that the impairment "substantially limits

one or more of the major life activities" (Section 12102(2)(A)).

Any mental disorder constitutes an impairment for ADA purposes

(Harrington v. Rice Lake Weighing Sys., Inc., 122 F.3d 456, 459

(7th Cir. 1997), citing 29 C.F.R. § 1630.2(h)). And in this

instance Byrne's deposition, the records from his hospital stay

and the statement of his physician all support the fact that he

suffered from major depression with psychotic features (B. Ex. A.

138-48; B. Ex. M; A. Ex. M).

But under Section 12102(2)(A) Byrne has the additional

burden of showing that such depression "substantially limits

[his] ability to perform a major life activity" (Schneiker v.

Fortis Ins. Co., 200 F.3d 1055, 1061 (7th Cir. 2000)). Whether

an impairment constitutes a disability depends on an

individualized assessment (Toyota Motor Mfg., Ky., Inc. v.

Williams, 534 U.S. 184, 122 S. Ct. 681, 692 (2002)).

Here Byrne urges that his impairment substantially limited
the major life activities of sleeping, thinking and interacting
with others (B. Mem. 8).  Although Avon concedes that those are
major life activities for ADA purposes, it argues that "[Byrne]
does not present any evidence to show how <u>his</u> depression
substantially limits <u>his</u> major life activities" (A. R. Mem. 8,
emphasis in original).  But the depositions of Byrne and his
relatives show that before his termination Byrne's mental state
had degenerated to the point where he was incoherent, suffered
sleep disturbances and hallucinations, had a paranoid belief that
his co-workers were spying on him and laughing at him, locked
himself away from his family, sliced his wrists with scissors and
had to be tricked before he could be taken to the hospital (B.
St. ¶¶94, 97, 98, 216, 244; A. Ex. M).  Byrne has thus presented
a genuine factual issue on that score.

As for the required showing that he is a "qualified
individual," Byrne must demonstrate both (1) that he satisfies
the prerequisites for the position, such as proper training,
skills and experience, and (2) that he is capable of performing
the essential functions of the job, either with or without
reasonable accommodation (<u>Bultemeyer v. Fort Wayne Cmty. Schs.</u>,
100 F.3d 1281, 1284 (7th Cir. 1996)).  Byrne clearly satisfies
the first requirement, for he had held the job of stationary
engineer with Avon for over four years and had received favorable

performance reviews (B. St. ¶¶63-64). But that is not enough: Byrne relies almost exclusively on his past performance while ignoring the second--and current--Bultemeyer requirement.

Under ADA "the burden of proof on the issue of capability is not on the employer but on the plaintiff" (Miller v. Illinois Dep't of Corrs., 107 F.3d 483, 484 (7th Cir. 1997)) At the time of his termination Byrne certainly was no longer a "qualified individual" without accommodation--repeatedly sleeping and reading while at work, as well as leaving in the middle of a shift, were failures to perform the "essential functions" of his job. And Byrne does not even attempt to show how or when, with reasonable accommodation, he would again become a "qualified individual." Instead he advances a bare assertion that "[t]he reasonable accommodation in this case would clearly be a leave for hospitalization and the extended day outpatient program" (B. Mem. 14). Byrne provides no medical or other relevant evidence to demonstrate what is needed, how long it would take, how it would affect his future ability to function as a stationary engineer and why the accommodation would be reasonable for his employer. Only a December 11 letter from Byrne's psychiatrist is in the record, and it simply stated that Byrne had been in "treatment" since November 17 and made the uninformative request that Avon "[p]lease take reconsideration regarding his employment status" (A. Ex. M). That is totally insufficient to establish a

triable issue as to whether some undefined reasonable
accommodation would restore Byrne to his status as a "qualified
individual."

Because Byrne has thus failed to adduce sufficient evidence
to show that he was a "qualified individual with a disability,"
he is not entitled to ADA protection. This opinion might well
end at this point. But further analysis shows that Byrne's ADA
claim is fatally defective in more than that respect: Even if he
had overcome that threshold hurdle, his failure to show that Avon
knew or should have known about his disability when it terminated
him would torpedo his claim in any event.

Avon's Awareness

Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 932 (7th Cir.
1995) articulates the obvious:

> At the most basic level, it is intuitively clear when
> viewing the ADA's language in a straightforward manner
> that an employer cannot fire an employee "because of" a
> disability unless it knows of the disability.

Byrne argues that Sparks and Korak were so concerned "about
Byrne's mental stability" that they decided to "cook up the idea
of installing the camera in the carpenter's shop" (B. Mem. 9).
That version of events is entirely speculative--Byrne has not
submitted a shred of evidence that Sparks, Korak or anyone else
at Avon knew or should have known of Byrne's disability at that
time. Sparks and Korak had the camera installed on November 11
after learning from Anderson's story and from their review of the

15

security log that Byrne might have a performance problem. Nothing in the record even hints at--let alone reflects on-- Byrne's mental state until the security guard's generalized comment to Sparks on the morning of November 17 that he had an "odd" conversation with Byrne (B. St. ¶165).[7] When Sparks retrieved Byrne's voicemail message, he learned nothing about Byrne's mental state, just that Byrne was "not feeling well" and would be out the rest of the week (A. St. ¶30).

In his conversations with Byrne's relatives on November 17 Sparks was told that Byrne was very ill, was too sick to come to the phone, had locked himself in the family room and his relatives were trying to get him to a doctor (B. St. ¶¶223, 233). Sparks recounts that when he finally did manage to speak with Byrne he was feverish and mumbling (B. St. ¶¶219-20). Thus Avon then had notice that Byrne was suffering from some sort of unidentified illness.

But there is nothing from which one could reasonably infer that the company should have known that Byrne had a mental disability serious enough to qualify him for ADA protection, as opposed to any of the countless possible temporary physical ailments (particularly manifesting themselves with feverishness) that could have caused such symptoms. In light of the combined

---

[7] And it requires a quantum leap to stretch the word "odd" in that way, as Byrne seeks to do.

information (or more accurately lack of information) that Avon's people then had, it is entirely understandable that (1) in order to get more information Sparks asked each sister if their brother had been acting unusual or strange lately (A. St. ¶¶36-37)(both answered "no") and (2) in partial response Rodgers asked Sparks if he had noticed Byrne being very depressed lately (B. St. ¶187). That scenario, when properly viewed with reasonable inferences in Byrne's favor, in no way supports his strained inferences not only that Sparks was "obsessed with Byrne's mental status," but also that Sparks and Korak's solution to their "extreme discomfort in dealing with a mentally ill employee was to terminate Byrne 'no matter what'" (B. Mem. 9-10).

Even more to the point, Avon was not required to have greater knowledge (or perhaps foreknowledge) than the information provided to Sparks in response to his concerned inquiries. Both Sheila and Rodgers answered him by saying they had not noticed anything strange about Byrne's behavior (A. St. ¶36; B. Ex. F at 44). Furthermore, Rodgers told Sparks that she "didn't know what was wrong with [Byrne]," and she admits that she did <u>not</u> tell Sparks that Byrne needed time off from work because she "had no idea" whether that was the case (A. Ex. B at 44, 49).

After all, "ADA does not require clairvoyance" (<u>Hedburg</u>, 47 F.3d at 934). Surely the brief reference by the security guard to an "odd" conversation did not equate to a suggestion that

Byrne suffered an impairment before the November 17 decision was made to discharge him. Again all of Avon's other information came from the conversations that Sparks had with Byrne and his relatives on the morning and afternoon of the 17th. It would be entirely unreasonable to infer that merely by asking about Byrne's behavior, Sparks somehow divined (with more insight than Byrne's own sisters)(1) that Byrne was suffering from a mental as opposed to purely physical illness, (2) that such mental illness was of sufficient severity to qualify under and (3) that the unknown illness had caused Byrne's sleeping and reading on the job nearly a week earlier, so that Sparks and Korak decided to terminate Byrne to avoid their responsibilities under federal law. This Court is not required to draw such unreasonable inferences.

Byrne attempts to manufacture a triable issue by claiming that he "was only fired after Avon learned he was in the hospital" (B. Mem. 9). But Avon's management decided to terminate Byrne on November 17 after he failed to show up for the scheduled 3:30 p.m. meeting--a fact that even Byrne admits (B. Resp. ¶43). And as n.5 has discussed, Rodgers herself corroborates Sparks' testimony that he first learned of Byrne's hospitalization on November 18.

In sum, Byrne has failed to show that he was fired "because

of" his disability.[8]  Because failure on the causation element also dooms his attempt to establish a prima facie ADA case under either the Foster (failure to accommodate) test or the Gorbitz (disparate treatment) test, there is no need to consider Byrne's pretext argument.

## FMLA Claim

Byrne argues that Avon's failure to grant him FMLA leave when it learned he was hospitalized violated FMLA (B. Mem. 14-15).  But a conclusive and fatal flaw in that position (and there are others) is that FMLA does not protect employees whose discharge would have occurred despite FMLA leave entitlement.  As stated in Kohls v. Beverly Enters. Wis., Inc., 259 F.3d 799, 805 (7th Cir. 2001)(adapted to this case):

> However, an employee may be fired for poor performance when [he] would have been fired for such performance even absent [his] leave.

See also 29 U.S.C. §2614(a)(3)(B)).  What has already been said establishes that Byrne cannot overcome Avon's assertion that he would have been terminated regardless of any leave to which he may have been entitled, because he repeatedly neglected his work responsibilities by sleeping and reading in the carpenter's shop for extended periods.

---

[8]  It bears repeating that due to Byrne's failure on the "qualified individual" branch of the statutory inquiry, the conclusion just stated in the text would be the same even if the just-completed causation analysis had come out the other way.

## Conclusion

While Byrne's difficulties evoke sympathy, what controls here is his inability to present evidence from which a reasonable jury could find in his favor on either of his federal claims. Because Byrne has not shown any genuine issue of material fact, Avon is entitled to a judgment as a matter of law. Its summary judgment motion is granted in its entirety, and this action is dismissed with prejudice.

Milton I. Shadur
Senior United States District Judge

Date: May 22, 2002